UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 15-20200 |
| | Honorable Laurie J. Michelson |
| v. | |
| D3-OCTAVIUS SCOTT, | |
| Defendant. | |

## OPINION AND ORDER DENYING MOTION FOR REDUCTION IN SENTENCE [582]

Octavius Scott was part of a crew of robbers who broke into the homes of families of Indian and Asian descent, rounded up the occupants at gunpoint, including children and the elderly, bound them with duct tape, and then searched the homes for jewelry and cash, taking what they found.

To his credit, Scott cooperated almost immediately and testified at the two trials of his co-defendants, helping to secure their convictions. When he was ultimately sentenced, Scott received significant cooperation credit as well as the benefit of the change in law on the "stacking" of convictions under 18 U.S.C. § 924(c). Scott also received an additional downward variance, due in part to his mental health struggles. And then last year, the Court granted in part Scott's request for a compassionate release sentence reduction due to the overly harsh nature of his pre-trial and early post-sentencing detention.

Scott is now back before the Court, pro se, again requesting compassionate release. (ECF No. 582.) He does not feel he is receiving adequate mental health treatment. Thus, Scott wants an additional one-year reduction in his prison time. The government opposes the request. (ECF No. 586.) The issues have been fully briefed and most have already been addressed during Scott's sentencing and in connection with his prior motion for compassionate release. Thus, no further argument is necessary. *See* E.D. Mich. LR 7.1(f). For the reasons that follow, the motion is DENIED.

## I.

"For nine months in 2014, [Juan] Olaya led a three-to-four person 'robbery crew.' Criss-crossing the nation, the crew held up more than a dozen families at gunpoint, usually targeting Asian and South-Asian families." *United States v. Olaya*, No. 21-1498, 2023 U.S. App. LEXIS 484, at *1 (6th Cir. Jan. 9, 2023). Chaka Castro planned and organized these armed invasions. *United States v. Castro*, 823 F. App'x 375, 376 (6th Cir. 2020). Octavius Scott was one of the physical enforcers who entered the homes carrying a firearm. Along with Castro, Olaya, and other members of the crew, Scott was indicted for racketeering conspiracy, assault with a dangerous weapon in aid of racketeering, and use of a firearm during a crime of violence. (ECF No. 96.)

Following his guilty plea to the conspiracy count and two § 924(c) counts (ECF No. 304), Scott was one of the government's key witnesses in the separate trials of Castro and Olaya. It took many years for the cases to get to trial. As a result, Scott

spent nearly five and a half years in pre-trial detention. This exacerbated his mental

health issues. Scott had a difficult upbringing marred by abuse, neglect, drug use,

and an overall unstable living environment. (Presentence Report, ¶¶ 155–159, 168.)

He later enlisted in the Army and served a stressful and dangerous tour of duty in

Afghanistan, where he was responsible for clearing roads of improvised explosive

devices. (ECF No. 582, PageID.10273.) Following his discharge from the Army, his

marriage ended. Scott then got involved in the underlying criminal activity resulting

in his cooperation, conviction, and prolonged detention. (*Id.* at PageID.10274.)

Prior to Scott's sentencing, and after being notified of his mental health

struggles, the Court ordered a mental health evaluation and then a competency

evaluation by the Bureau of Prisons. (ECF No. 273.) Scott has consistently been

diagnosed with post-traumatic stress disorder, persistent depressive disorder, and

adjustment disorder with depressed mood and anxiety. (Presentence Report, ¶ 166;

ECF No. 582, PageID.10276; ECF No. 587-1, PageID.10451 (sealed).)

His mental health issues were addressed in the Presentence Report and at

sentencing. (Presentence Report, ¶¶ 162–167; ECF Nos. 461, 551.) Indeed, the Court

focused on the challenge in balancing Scott's future potential—his continuous efforts

to overcome significant adversity, his service to the country, his intelligence, and his

remorse—with the significant and sometimes violent role he played in a serious and

dangerous criminal enterprise. (ECF No. 551.) After thoroughly considering the

sentencing factors under 18 U.S.C. § 3553(a) and the government's motion for a

downward departure to 192 months based on Scott's substantial assistance, the Court

sentenced Scott to 174 months' imprisonment on June 30, 2020. (ECF Nos. 470, 480.) The Court also recommended that Scott "be housed at FCI Bastrop," a BOP correctional facility in Scott's home state of Texas, "or a low security correctional institution." (*Id.*) This was due to concern for Scott's mental health and physical safety because of his role as a cooperator.

Scott, however, was housed at FCI McKean, a medium-security prison in Pennsylvania. Scott did not feel safe at this facility, nor did he feel he was receiving adequate mental health treatment. Scott had been designated Care Level 1, which typically refers to relatively healthy inmates who "may have limited medical needs that can be easily managed by clinician evaluations every 6–12 months." Fed. Bureau Prisons, *Care Level Classification for Medical and Mental Health Conditions or Disabilities* (May 2019), https://www.bop.gov.

So in August 2021, Scott filed a motion for compassionate release. (ECF No. 536.) He sought to have his sentence reduced by two years given the harshness of his confinement—primarily the exacerbation of his mental health issues with little rehabilitative or treatment opportunities during the pandemic lockdowns, his distance from family and community support for nearly seven years, and his constant fear for his safety. (*Id.*) These were not things the Court took into consideration at the sentencing. At that time, the Court did not know the true scope of the pandemic, expected Scott to be in a safe environment close to his home, and expected him to receive substantial mental health treatment following the pre-sentence psychological evaluations. After substantial briefing (ECF Nos. 536, 540, 541, 544, 554, 561) and

several hearings (ECF Nos. 568, 572), the Court granted the motion in part and reduced Scott's sentence by 14 months (ECF Nos. 569, 572).

About a year later, in May 2023, Scott was transferred to FCI Englewood in Colorado where he was enrolled in the Veterans Education Transitional Services program. (ECF No. 586, PageID.10382.) During his intake screening, he was again diagnosed with major depressive disorder and PTSD. (ECF No. 587-1, PageID.10458–10459 (sealed).) But now, the BOP designated Scott as a Care Level 2, assuring, at a minimum, monthly mental health treatment sessions. (*Id.*)

But Scott feels he is still receiving inadequate mental health treatment. (ECF No. 582.) At the same time, he says he has made great strides toward rehabilitation and that, given his lack of criminal history and time already served, he does not pose a future risk of danger to the community. (*Id.*) Thus, Scott seeks another one-year reduction off his sentence with a corresponding increase to his period of supervised release. (*Id.*) The government opposes the motion. (ECF No. 586.) The government contends that Scott is receiving regular mental health care, medication, and educational programming. (*Id.* at PageID.10381.) In support, the government has provided Scott's recent medical and psychological treatment records from the BOP. (ECF No. 587 (sealed).)

The Court agrees that an additional compassionate release reduction is not warranted. The Court has not been shy in expressing its desire for Scott to receive robust mental health care so he can successfully reacclimate to society and fulfill his noticeable potential. And while it would be generous to label Scott's prison care as

robust, his situation is improving. True, Scott endured a lengthy period of pre-trial detention, which the Court took into account at sentencing. And he struggled at FCI McKean, which the Court took into account during his prior motion for compassionate release. But the record presently before the Court reveals that Scott is receiving more regular treatment and programming at Englewood and has been advised that even more is available upon request. (ECF No. 587-1 (sealed).) Scott has not demonstrated extraordinary or compelling circumstances warranting relief. Nor does an analysis of the § 3553(a) factors support a further sentence reduction.

## II.

A district court generally "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). One exception to this rule is compassionate release. The compassionate release statute allows the Court to reduce a defendant's sentence if it finds, after a defendant has exhausted his administrative remedies or 30 days after the warden receives a request for compassionate release, that "extraordinary and compelling reasons" warrant a reduction; that a reduction is "consistent with applicable policy statements issued by the Sentencing Commission"; and that the sentencing factors under 18 U.S.C. § 3553(a), to the extent they apply, support a reduction. 18 U.S.C. § 3582(c)(1)(A). The Sentencing Commission has recently amended its policy statement in U.S.S.G. § 1B1.13 to cover compassionate-release motions filed directly by defendants (as well as those brought by the Director of the Bureau of Prisons). It remains the case, though, that without an "extraordinary

and compelling" reason, the district court may not grant compassionate release. *See United States v. Hunter*, 12 F.4th 555, 572 (6th Cir. 2021).

### A.

The First Step Act's exhaustion requirement is mandatory. *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). It has been satisfied here. Scott sought compassionate release from the McKean Warden on March 28, 2023 (ECF No. 586-5, PageID.10405), and was denied on March 31, 2023 (*id.* atPageID.10406). Scott also asked the Englewood Warden to file a motion for compassionate release on his behalf, which did not happen. (ECF No. 582, PageID.10368.)

### B.

The next hurdle is whether Scott has an extraordinary and compelling reason to reduce his sentence by another year.

District courts have defined an "extraordinary and compelling reason" as "one that is 'beyond what is usual, customary, regular, or common,' and is 'so great that irreparable harm or injustice would result if [the relief] is not granted.'" *United States v. Powell*, No. 21-1262, 2021 U.S. App. LEXIS 28980, at *3–4 (6th Cir. 2021) (order) (citing cases). This is consistent with the Act's legislative history, in which "[t]he Senate Judiciary Committee explained that § 3582(c)(1)(A)(i) 'applies, regardless of the length of sentence, to the unusual case in which the defendant's circumstances are so changed, such as by terminal illness, that it would be inequitable to continue the confinement of the prisoner.'" *Hunter*, 12 F.4th at 570 (quoting S. Rep. No. 98-225, at 121).

**1.**

The Sentencing Commission's amended policy statement, now in effect, expands the defendant's medical circumstances that constitute "extraordinary and compelling reasons." U.S.S.G. § 1B1.13(b)(1). Scott primarily relies on two of them. First is the situation where a defendant is "suffering from a serious functional or cognitive impairment . . . that substantially diminishes [his] ability . . . to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover." § 1B1.13(b)(1)(B)(ii). According to Scott, he has an impaired mental state from his rough upbringing and military service that has been exacerbated by a lengthy and difficult period of pre-trial detention during the pandemic, and thus, a lack of adequate mental health care diminishes his ability to provide self-care. (ECF No. 582.)

The Court disagrees. While Scott's treatment records reveal his ongoing struggles with depression, anxiety, and anger management, nothing suggests they prevent Scott from providing self-care. (ECF Nos. 587-1, 587-2 (sealed).) From everything the Court has reviewed and observed, it appears Scott feeds and grooms himself, works, exercises, writes poetry, and participates successfully in programming. (*See, e.g.*, ECF No. 587-1, PageID.10446 (Scott reported to his counselor in June 2023 that he is working, taking education courses, and participating in treatment programming through Psychology Services) (sealed); ECF No. 589, PageID.10584.)

The second potentially applicable extraordinary and compelling reason arises when a "defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." § 1B1.13(b)(1)(C). The core of Scott's request for compassionate release is his deteriorating mental health, the BOP's alleged inability to treat combat-related PTSD, and the BOP's alleged failure to adequately treat Scott's PTSD. (*See* ECF No. 589.) But this does not warrant a further reduction in Scott's sentence.

For starters, courts have held that "[PTSD] is neither extraordinary nor compelling" in the context of compassionate release. *United States v. Morris*, 643 F. Supp. 3d 750, 756 (E.D. Mich. 2022); *see also United States v. Ruiz*, No. 17-CR-227, 2021 U.S. Dist. LEXIS 69820, at *6–7 (S.D. Ohio Apr. 12, 2021). And the fact that the U.S. Department of Veterans Affairs may provide more skilled treatment to veterans (*see* ECF No. 589, PageID.10531) does not mean the BOP is incapable of providing any.

Nor is the BOP's treatment of Scott so deficient as to rise to the level of extraordinary and compelling. Scott's motion and reply brief cite compassionate release cases from across the country. But the inquiry into what constitutes extraordinary and compelling circumstances is very fact specific, and the defendants' circumstances in those cases do not mirror this one. True, by designating Scott as Care Level 1, FCI McKean likely deprived him of additional, helpful treatment. But, contrary to what Scott argues, the Court's prior ruling on his motion for

9

compassionate release already considered his struggles at McKean, including with his mental health, and was not limited to his detainment being far from home. (*See* ECF No. 572, PageID.10234–10235 (holding that there were "extraordinary and compelling reasons to reduce Scott's sentence for [the] 14-month period [between November 10, 2020, and January 22, 2021,]" during which he was incarcerated at McKean, including "how far Scott has been from home and for how long[,]" "his programming needs, his mental health needs, his security needs, and the court's sentencing recommendation, coupled with the obvious importance of providing Scott adequate rehabilitation to successfully reintegrate into society, [and] the lack of consistent BOP explanations").)[1] And the lack of treatment and programming during the pandemic affected all inmates, making it anything but extraordinary as to Scott. *See, e.g.*, *United States v. MacLloyd*, No. 08-20289, 2023 U.S. Dist. LEXIS 4588, at *3–4 (E.D. Mich. Jan. 10, 2023) ("MacLloyd also alleges that as a result of the pandemic and staffing shortages, his facility is frequently in lockdown and conditions are harsher than contemplated when he was sentenced. However, such circumstances

---

[1] Scott is correct to point out that under the amended policy statement "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." § 1B1.13(e). This is a change from the current law in this Circuit. *See Hunter*, 12 F.4th at 570 ("[F]acts that existed at sentencing cannot later be construed as 'extraordinary and compelling reasons' to reduce a final sentence.") But the *existence* of the facts is not the issue here. The point is that in sentencing Scott to a below-guidelines sentence and in later reducing his sentence, the Court already relied on many of the facts Scott wants to use again for an additional reduction—e.g., his difficult upbringing, military service, post-deployment mental health difficulties which contributed to the commission of the underlying offense, lengthy pre-trial detention, court-ordered mental health evaluation revealing his PTSD, and the harsh conditions at FCI McKean due to the pandemic. They do not warrant yet *another* sentencing reduction.

affect all prisoners and therefore cannot be considered 'extraordinary.'"); *United States v. Brant*, No. 18-20155, 2022 U.S. Dist. LEXIS 214003, at *8 (E.D. Mich. Nov. 22, 2022) ("[T]he Court agrees with the Government that loss of access to rehabilitative programming—whether because of the state detainer or the pandemic—does not constitute an 'extraordinary and compelling reason' for sentence reduction."); *United States v. McNeair*, Nos. 22-25/15-322, 2023 U.S. Dist. LEXIS 129337, at *13 (W.D. Wash. July 25, 2023) (reiterating that "general conditions that affect inmates indiscriminately throughout the prison are insufficient to support an individual defendant's claim for compassionate release").

More significant, while Scott had to endure additional time at McKean following the Court's ruling, he was eventually transferred to FCI Englewood, a low-security facility in Colorado. (ECF No. 587-1, PageID.10466 (sealed).) Prior to his transfer, he had successfully completed the non-residential drug and alcohol program. (*Id.* at PageID.10467–10470.) After his transfer, he was enrolled in the Veterans Education Transitional Services program, which is designed to address the "unique needs and challenges faced by incarcerated Veterans." (ECF No. 586, PageID.10390; ECF No. 589, PageID.10571.) The government explains that the program is "based on a community model in which the environment intertwines uniformed service core values with veteran centric programs, services, and benefits education." (ECF No. 586, PageID.10382–10383; ECF No. 589, PageID.10571.)

On May 15, 2023, less than two weeks after his arrival at Englewood, Scott's care level was "increased to CARE2," which means he "is being seen monthly to

address symptoms related to his diagnoses of major depressive disorder and posttraumatic stress disorder." (ECF No. 587-1, PageID.10451 (sealed).) Scott also had a clinical session on May 22, 2023, at his request, to discuss his difficulty adjusting to Englewood. (*Id.* at PageID.10455.) Given his mental health issues, he was subsequently enrolled in the Traumatic Stress and Resilience Workshop to begin group treatment. (*Id.* at PageID.10453, 10455.) After completing the workshop, Scott's scores on the self-assessment measures indicated he may be experiencing trauma-related mental health symptoms. "As a result, he will be seen to discuss additional treatment options." (*Id.* at PageID.10440.)

Scott's medical records reveal that he has participated in his monthly clinical contacts on June 9, 2023, July 7, 2023, August 3, 2023, and September 5, 2023. (*Id.* at PageID.10439, 10441, 10445, 10446.) He is reminded at every session that he can request additional mental health services between sessions. (*Id.*) Scott received a medication referral during his July 7 session and had another treatment session on July 11, 2023, to obtain medications for anxiety and depression. (ECF No. 587-2, PageID.10474–10475 (sealed).) While Scott did not receive any medications promptly, he was eventually given an anxiety medication on August 3. (ECF No. 587-1, PageID.10441 (sealed).) Scott has also successfully completed some health-related courses. (ECF No. 586, PageID.10385.)

In short, Scott is now receiving monthly mental health visits and can request additional sessions as needed. Nothing suggests he has made any requests that have been denied. The Court appreciates Scott's desire to obtain "better help in order to

recover and re-enter society more effectively and to be a better person." (ECF 582, PageID.10281.) At present however, he has access to adequate treatment, workshops, and programs in Englewood. His preference for treatment at the VA is not an extraordinary and compelling reason for his early release.

**2.**

That leaves Scott's rehabilitative efforts and his self-diagnosis that he is no longer a threat to society. The Sentencing Commission has recently confirmed that "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of [its] policy statement." § 1B1.13(d). But "rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." *Id.*

Scott says that he has made strides in his self-reform despite the lack of programming and mental rehabilitation. (ECF No. 582, PageID.10290.) There is undoubtedly some truth to this, as Scott's history is one of working to overcome the adversities in his life. But he is sparse on the details. In light of the restrictions during the pandemic and the amount of time Scott has been incarcerated, his level of rehabilitative activities does not jump out as extraordinary or compelling. Especially when compared with some of the cases he cites. *See, e.g., United States v. Decator*, 452 F. Supp. 3d 320, 325–26 (D. Md. 2020) (defendant "participated in over 1,500 hours of programming," "completed more than 70 courses," and obtained letters from a counselor prepared to provide training, two business owners prepared to offer

employment, and two clergy members prepared to welcome defendant into their congregations upon release); *United States v. Redd*, 444 F. Supp. 3d 717, 729 (E.D. Va. 2020) (record established defendant had no "major disciplinary infractions" over 23 years of incarceration and no infractions at all in the past 5 years; that he "devot[ed] hundreds of hours to vocational programs"; that he "assist[ed] others in their rehabilitative efforts"; that he "car[ed] for mental health inmates"; and that he consistently "exceed[ed] his supervisor's expectations at work").

Moreover, Scott's personal characteristics, family support, and low probability of recidivism were all taken into account in the imposition of his below-guidelines sentence. Even when combined with Scott's rehabilitative efforts, they do not create an extraordinary and compelling reason to further reduce his sentence. And finally, Scott's persistent concerns about his ability to control his anger issues, as reflected in his treatment records (ECF No. 587-1 (sealed)), suggest that it may be a little premature to declare him risk-free.

## C.

Even if extraordinary and compelling reasons existed, the relevant § 3553(a) factors do not support Scott's request for a further sentence reduction. *See United States v. Ruffin*, 978 F.3d 1000, 1008 (6th Cir. 2020) ("We have repeatedly recognized that district courts may deny relief under the § 3553(a) factors even if extraordinary and compelling reasons would otherwise justify relief.").

Scott engaged in serious and dangerous criminal activity that spanned several states and went on for many months. Families were terrified and traumatized. They

lost the security of their homes. Many lost their most valuable possessions. The government is right that even accounting for Scott's history and characteristics, "any further reduction to Scott's sentence would constitute a failure 'to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.'" (ECF No. 586, PageID.10396) (quoting 18 U.S.C. § 3553(a)(2)(A)).

### III.

For all these reasons, Scott's motion for compassionate release is DENIED. The Court will, however, recommend that the BOP place Scott into a halfway house as early as possible.

SO ORDERED.

Dated: November 30, 2023

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE